

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BERNICE CINTRON,

          Plaintiff,

  - against -

RICHARD FLEISCHMAN & ASSOCIATES, INC.,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

09 Civ.

COMPLAINT

ECF CASE

PLAINTIFF DEMANDS A TRIAL BY JURY

       Plaintiff Bernice Cintron ("plaintiff" or "Cintron"), through her attorneys Vladeck, Waldman, Elias & Engelhard, P.C., complains of defendant Richard Fleischman & Associates, Inc. ("defendant" or "RFA"), as follows:

## NATURE OF THE ACTION

       1.    Plaintiff brings this action to remedy sex discrimination in employment and to remedy retaliation for her opposition to such unlawful employment actions in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); the New York State Human Rights Law, Executive Law § 296 et seq. (the "Executive Law"); and the Administrative Code of the City of New York § 8-101 et seq. (the "City Law").

       2.    Plaintiff seeks injunctive and declaratory relief, damages, and other legal and equitable relief pursuant to Title VII, the Executive Law, and the City Law.

## JURISDICTION AND VENUE

       3.    The Court has jurisdiction over plaintiff's Title VII claim pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1331. The Court has supplemental jurisdiction over plaintiff's Executive Law and City Law claims pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Southern District of New York.

5. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against defendant on or around April 24, 2007, complaining of the acts of discrimination and retaliation alleged herein. On or about April 14, 2009, the EEOC found reasonable cause to believe that defendant violated Title VII. On or about May 29, 2009, the EEOC issued plaintiff the right to sue. Plaintiff has complied fully with the administrative prerequisites of Title VII.

6. Pursuant to § 8-502(c) of the City Law, prior to filing this Complaint, plaintiff served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

## PARTIES

7. Plaintiff is a female resident of New York City. She was employed at defendant's office in Manhattan until the termination of her employment in September 2006.

8. Defendant is a New York corporation with its principal place of business in Manhattan. Defendant is an employer within the meaning of the Title VII, the Executive Law and the City Law.

## FACTUAL ALLEGATIONS

9. In 1997, Cintron earned her Bachelor of Arts degree in Communications with a concentration in Legal/Political Studies and Psychology. She has earned numerous professional certificates in the Human Resources ("HR") field and participated in several HR-related continuing education programs and seminars. She also earned her Paralegal Certification in 2005.

10. From 2000-2005, Cintron worked as both an HR Manager and OSHA Compliance Officer and then as an HR Consultant for several companies where she provided services such as staff development and training, and company reorganization. She presented instructional seminars on sexual harassment, ADA, FMLA, equal employment opportunity, and employee lawsuit prevention.

11. Cintron began working for RFA as an independent contractor on May 2, 2005. She provided recruitment services and other HR duties, such as vender negotiations, revision of the policy manual, dismissals, unemployment insurance claims, and consultation on employee conflicts. At the outset, she performed the majority of work from her home.

12. In February 2006, Cintron accepted a full-time position as the HR Director's Assistant in the HR department at RFA. She began work on February 27, 2006, reporting to Michael O'Neill ("O'Neill"), the HR Director.

13. One week prior to her start date, on or about February 20, 2006, O'Neill unsuccessfully attempted to dissuade Cintron from joining RFA full-time. He told her that she "wouldn't be able to handle the separation from [her] son," and said that she may just quit shortly after starting. Cintron assured him that she could handle the position and was eager to join RFA full-time.

14. Within a week of her employment, Cintron learned that she did not have many job responsibilities because many of the HR responsibilities were out-sourced to different consultants. She realized that O'Neill was looking primarily for a secretary.

15. In or about April 2006, O'Neill was dismissed as HR Director. Richard Fleischman ("Fleischman"), President and CEO of RFA, promoted Cintron to HR Director as O'Neill's replacement. With the promotion, Cintron reported directly to Fleischman.

16. During Cintron's tenure as HR Director, RFA employed over 85 male employees, and only five female employees. RFA's management team consisted of five male employees, and only one female employee, Cintron.

17. From the beginning of Cintron's employment as HR Director, she was subjected to a gender-based hostile work environment created by her supervisor and male co-workers.

18. When Cintron received the promotion to HR Director, Fleischman told her that he wanted her and Michel Curry ("Curry"), Director of IT Operations, to work as a team to oversee the operations of RFA. However, Curry refused to interact with Cintron professionally and appropriately. He frequently spoke to her in a demeaning and intimidating manner. Cintron never saw Curry treat any men in such a manner. Cintron complained to Fleischman, who refused to address Curry's inappropriate behavior. Fleischman advised Cintron to "work less and spend more time at home with [her] son." Cintron never heard Fleischman or other senior managers tell male employees to spend more time their children.

19. When Cintron complained to Fleischman about Curry's treatment of her, Fleischman admitted "there are some men who don't take well to women being in a power position." Fleishman then directed Cintron to hire a male supervisor because a "strong presence" was needed in the department.

20. In July 2006, Richard Mangilomini ("Mangilomini") joined RFA as a Director of Administration. Fleischman hired Mangilomini to supervise Curry and the Operations Department. Immediately upon his hiring, Mangilomini was hostile and demeaning to Cintron and interfered with her work, contributing to the hostile work environment.

21. For example, Mangilomini precluded Cintron from attending HR-related meetings and functions, despite her role as the HR Director. Although Mangilomini was not responsible for supervising Cintron, he further interfered with Cintron's role as HR Director by changing the recruitment and hiring procedures without her knowledge. When Cintron asked about certain changes in the hiring process, Mangilomini told her that he did not understand why she was involved in the interview process and that "change was needed because recruitment procedures were not working." Mangilomini assigned HR duties, such as recruitment and resume review, to employees in the IT department who had no prior training or experience in these HR-related duties. Mangilomini also removed Cintron's responsibilities for compensation time review and approval. Fleischman reinforced Mangilomini's discriminatory treatment of Cintron by copying Mangilomini and Curry (and other members of the executive staff who had no hiring responsibilities) on demeaning emails to her telling her to "keep [her] opinions to herself" and that her employee recommendations "made no sense."

22. Fleischman not only allowed Mangilomini to mistreat Cintron, but he also joined in the discriminatory treatment of her. For example, on or about July 21, 2006, Fleischman directed Cintron to call an employee. One week after Cintron's call to this employee, Fleischman summoned her to a meeting and aggressively reprimanded her for calling this employee. Fleischman denied his prior instructions to Cintron and told her she had no right to call the employee. He told Cintron that she did not have any friends in the company and that she was "not one of the guys." Fleischman then told her that she was not to communicate with any members of the staff, effectively preventing her from carrying out most of her duties.

23. Fleischman had no legitimate reason to strip Cintron of her duties. Throughout her employment, she performed her duties as HR Director and HR Director's

Assistant with professionalism and expertise. For example, by September 2006, she increased the number of new hires since 2004 by 80%.

24.  Moreover, despite Cintron's role as HR Director, Fleischman and Mangilomini did not consult her when the Benefit Brokerage of Record was changed, one of the essential functions of her position.

25.  On several occasions, Cintron complained to Fleischman verbally and in writing about the discriminatory treatment by Mangilomini and other male co-workers, and the removal of her job duties. Not only did Fleischman ignore her complaints, but he also escalated the discriminatory treatment of her.

26.  In August 2006, a dispute arose as to who was responsible for entering the new hires into RFA's database. Cintron emailed Fleischman and volunteered to assume that responsibility so as to avoid any future confusion. In response, Fleischman summoned her to a conference call with Mangilomini, Curry and himself in which he berated her for trying to assume that responsibility. During the phone conference, Fleischman insulted Cintron by saying she was "an embarrassment to RFA, to Human Resources and to management." Fleischman did not speak to the male directors at RFA in this hostile manner.

27.  By August 8, 2006, Fleischman stripped her of nearly all of her duties and reassigned them to Mangilomini. Cintron was effectively demoted to an entry level administrative assistant position, and subjected to continued hostile treatment from Fleischman and Mangilomini. On or about August 21 or 22, 2006, Fleischman removed all of Cintron's responsibilities for interviewing and hiring.

28.  On September 1, 2006, Fleischman again aggressively berated Cintron, this time for supposedly hiring a person who required training. Fleischman refused to

acknowledge that Cintron could not have hired anyone because previously he had prohibited her from performing those duties. Cintron emailed Fleischman to explain that she was no longer responsible for those types of workplace actions and that Mangilomini was aware of the hiring. Cintron also wrote that Mangilomini "had taken full control of the HR dep[artment]." Upon information and belief, Fleischman shared this email with Mangilomini, who in response to the email, told Cintron she was "pathetic."

29. Later on September 1, 2006, Cintron complained of the discriminatory treatment to Fleischman by email. She requested a meeting to discuss the issues. That evening, her handheld email device was not working and when she returned home she could not log into the RFA system remotely. The next day, September 2, 2006, a former employee told Cintron that on September 1, 2006, at the end of the day, the entire company received an email announcing that Cintron no longer worked at RFA. Cintron again attempted to access her company email remotely and was denied access. Cintron then checked her personal email account and received an email from Fleischman that she was fired. Fleischman told her they would meet the following Tuesday to finalize her dismissal.

30. On September 4, 2006, Cintron went into the office to meet with Fleischman. She explained to him that the email she sent on September 1, 2006 was a request to discuss the hostile work environment, and she had not wanted to lose her job. Fleischman refused to discuss her employment or complaints of discrimination, offered to provide her with a positive reference, and handed her a severance agreement.

31. Two weeks later, on September 19, 2006, Cintron informed Fleischman by email that she had retained an attorney because the company refused to address her complaints of

gender discrimination. She advised Fleischman that all future communications about the severance agreement should be directed to her attorney.

32.  Just two days later, on September 21, 2006, Fleischman revoked Cintron's severance offer.

33.  Despite her successful performance at RFA, Cintron was fired, whereas male employees who actually engaged in misconduct or poorly performed their jobs were not. A few of the examples include:

- Curry, whom Fleischman reprimanded numerous times throughout his employment with RFA for deficiencies such as failing to follow instructions, follow up on projects, prioritize projects, and supervise the office move resulting in thousands of dollars in stolen equipment, remained the Director of Operations at RFA until 2008, upon information and belief. Although the possibility of firing Curry was discussed throughout the years, Fleischman said did not want to fire him because Curry "has a family and a mortgage."

- One male former field technician received numerous client complaints and was even banned from entering one of the buildings where a client was located. The field technician was not fired at that time, but was demoted to the Help Desk because, as Fleischman told Cintron, "he had a new baby to support."

- A male Logistics/Purchasing Manager sent a series of racist emails that greatly upset many employees. He also stole tens of thousands of dollars through fraudulent purchases that were entered into RFA's systems as

client purchases. The Logistics/Purchasing Manager was not fired; he was sent to anger management classes, suspended for a week, and was demoted.

- A man who formerly was the Help Desk Manager was found to be verbally abusive to employees and incompetent in performing his job duties. He was not fired, but only demoted.

- Another male field technician assaulted an employee with a chair, and was also reprimanded for not coming to work. The field technician, upon information and belief, was not fired, but quit his employment with RFA, was given a severance agreement, and collected unemployment benefits. Upon information and belief, he was rehired several months later.

34. In further retaliation against Cintron, RFA contested her application for unemployment benefits following her firing. Upon information and belief, RFA contested her application for benefits after she sent the September 19, 2006, email informing Fleischman that she had retained counsel. RFA falsely stated to the New York State Department of Labor ("DOL") that Cintron had "voluntarily abandoned her position without good cause." Upon information and belief, Mangilomini falsely informed the DOL that Cintron not only resigned, but had also waived her unemployment benefit rights under a severance agreement.

35. The DOL investigated RFA's claim that Cintron resigned. The DOL found that Cintron did not intend to quit her job and that "there is no evidence of wrongdoing on her part." The DOL subsequently ruled in her favor and reinstated her benefits.

36. RFA continued to retaliate against Cintron by providing prospective employers negative references when asked to verify Cintron's employment with RFA, despite

Fleischman's promise to provide a positive reference. Following her firing, Cintron applied for and interviewed for various positions. However, she was unable to secure a new position despite her extensive experience and qualifications. Cintron hired a professional reference report checker to determine whether RFA was providing negative employment references to prospective employers. The investigation revealed that not only was the RFA HR department neglecting to return prospective employer phone calls, but also that Mangilomini expressed negative opinions of Cintron. Mangilomini told one reference checker that Cintron was not eligible for rehire, and that she lacked mentoring and team building skills. When the reference checker finally reached Rachel Norris ("Norris"), the new HR Director, Norris provided incorrect dates of hire, refused to recommend Cintron and refused to provide further information about her. During Cintron's tenure as HR director, the reference policy required an employee to complete an Employment Verification Form, which authorized HR to provide the necessary information to a potential employer. Norris did not ask Cintron to complete such a form, and provided the inaccurate information without the proper authorization.

37. On or about April 24, 2007, Cintron filed a complaint of discrimination with the EEOC.

38. On April 15, 2009, the EEOC issued a determination on the merits. The EEOC found reasonable cause that RFA disparately treated, harassed, and retaliated against Cintron due to her gender and complaints of gender discrimination. The EEOC also determined that one email submitted by RFA to the EEOC that purportedly showed Cintron's offer of resignation was redacted to omit words indicating that Cintron did not offer to resign and that another email submitted by RFA had been falsified. The EEOC also found that a recruiting agent RFA claimed had complained about Cintron actually spoke very highly of her.

## FIRST CAUSE OF ACTION

### Sex Discrimination Under Title VII

39. Plaintiff repeats and realleges paragraphs 1-38 as if fully set forth herein.

40. By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex in violation of Title VII.

41. Plaintiff is now suffering and will continue to suffer irreparable injury, emotional distress, reputational damage, and other compensable damage as a result of defendant's discriminatory acts.

42. Defendant acted intentionally and with malice and/or reckless indifference to plaintiff's federally protected rights.

## SECOND CAUSE OF ACTION

### Retaliation Under Title VII

43. Plaintiff repeats and realleges paragraphs 1-42 as if fully set forth herein.

44. By the acts and practices described above, defendant retaliated against plaintiff in the terms and conditions of her employment for opposing unlawful employment practices, in violation of Title VII.

45. Plaintiff is now suffering and will continue to suffer irreparable injury, emotional distress, reputational damage, and other compensable damage as a result of defendant's retaliatory acts.

46. Defendant acted intentionally and with malice and/or reckless indifference to plaintiff's federally protected rights.

## THIRD CAUSE OF ACTION

### Discrimination Under the Executive Law

47. Plaintiff repeats and realleges paragraphs 1-46 as if fully set forth herein.

48. By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex in violation of the Executive Law.

49. Plaintiff is now suffering and will continue to suffer irreparable injury, emotional distress, reputational damage, and other compensable damage as a result of defendant's discriminatory acts.

## FOURTH CAUSE OF ACTION

### Retaliation Under the Executive Law

50. Plaintiff repeats and realleges paragraphs 1-49 as if fully set forth herein.

51. By the acts and practices described above, defendant retaliated against plaintiff in the terms and conditions of her employment for opposing unlawful employment practices, in violation of the Executive Law.

52. Plaintiff is now suffering and will continue to suffer irreparable injury, emotional distress, reputational damage, and other compensable damage as a result of defendant's retaliatory acts.

## FIFTH CAUSE OF ACTION

### Discrimination Under the City Law

53. Plaintiff repeats and realleges paragraphs 1-52 as if fully set forth herein.

54. By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex in violation of the City Law.

55. Plaintiff is now suffering and will continue to suffer irreparable injury, emotional distress, reputational damage, and other compensable damage as a result of defendant's discriminatory acts.

56. Defendant acted intentionally and with malice and/or reckless indifference to plaintiff's statutorily protected rights.

## SIXTH CAUSE OF ACTION

### Retaliation Under the City Law

57. Plaintiff repeats and realleges paragraphs 1-56 as if fully set forth herein.

58. By the acts and practices described above, defendant retaliated against plaintiff in the terms and conditions of her employment for opposing unlawful employment practices, in violation of the City Law.

59. Plaintiff is now suffering and will continue to suffer irreparable injury, emotional distress, reputational damage, and other compensable damage as a result of defendant's retaliatory acts.

60. Defendant acted intentionally and with malice and/or reckless indifference to plaintiff's statutorily protected rights.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter an award in favor of plaintiff:

(a) declaring the acts and practices complained herein are in violation of Title

VII, the Executive Law and the City Law;

(b)   enjoining and permanently restraining these violations of Title VII, the Executive Law and the City Law;

(c)   directing defendant to take such affirmative action as is necessary to ensure that the effects of these violations of are eliminated and do not continue to affect plaintiff's employment opportunities;

(a)   directing defendant to place plaintiff in the position she would have held but for defendant's discriminatory and retaliatory treatment of her, and to make her whole for all earnings she would have received but for defendant's discriminatory and retaliatory treatment, including but not limited to, wages, pension, interest and other lost benefits;

(e)   directing defendant to pay plaintiff compensatory damages, including damages for emotional distress, humiliation, and pain and suffering;

(f)   directing defendant to pay plaintiff additional amounts as punitive damages;

(g)   awarding plaintiff her reasonable attorneys' fees and costs;

(h)   awarding plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award; and

(i)   granting such other and further relief as the Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: New York, New York
       August 19, 2009

                              VLADECK, WALDMAN, ELIAS
                                   &ENGELHARD, P.C.

By: _____
     Anne L. Clark
     Tara Jensen
     Attorneys for Plaintiff
     1501 Broadway, Suite 800
     New York, New York 10036
     (212) 403-7300